IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CITY OF LITTLE ROCK, ARKANSAS                                   PLAINTIFF

v.                              Case No. 4:23-CV-00831-BSM

MARQUETTE TRANSPORTATION
COMPANY GULF-INLAND, LLC, *et al.*                              DEFENDANTS

PLAINTIFF CITY OF LITTLE ROCK, ARKANSAS'
MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>

## I.    PRELIMINARY STATEMENT

This case arises from a maritime allision that occurred on September 10, 2021, when eleven barges being pushed by the Defendants'[1] vessel, the M/V Kieffer E. Bailey ("Vessel"), broke free from the Vessel after an allision with an upriver protection cell of the I-30 bridge ("I-30"), and subsequently allided with the upriver protection cell (the "Cell") of the Plaintiff's, City of Little Rock, Arkansas ("COLR"), Clinton Pedestrian Bridge (the "Bridge") damaging it beyond repair (the "Allision").[2]

Under maritime law, a vessel is presumptively liable when it strikes a stationary object. As the Allision involved Marquette's moving Vessel's bareges striking the stationary I-30 protection cell and the stationary Clinton Bridge Cell, Marquette is liable. Marquette cannot rebut this presumption because it cannot demonstrate that (1) the Vessel acted without fault; (2) that the Allision was caused by the I-30 protection cell or the Clinton Bridge Cell; or (3) that the Allision was an unavoidable accident. Moreover, Marquette cannot limit its liability because the negligent

---

[1] Marquette Transportation Company Gulf-Inland, LLC, Marquette Transportation Company Holdings, LLC, Marquette Transportation Company, LLC, Marquette Transportation Holdings, Inc., Marquette Transportation Company Offshore, LLC, and Marquette Transportation Finance Corporation (collectively "Marquette").

[2] An allision is when a moving vessel or barge(s) strikes a stationary object. *See In re Am. Milling Co., Ltd*., 409 F.3d 1005 (8th Cir. 2005).

acts occurred within its knowledge or privity, precluding the application of any limitation of liability.

On September 10, 2021, the Vessel was navigating southbound on the Arkansas River while pushing eleven total barges, ten fully loaded barges containing wheat and one empty barge. Collectively, the barges are referred to as the Vessel's tow ("Tow"). The Vessel and its Tow were approximately 878 feet in length. The wheelhouse of the Vessel, where the Captain and Pilot steer the Vessel while pushing the Tow, is located at the very back of the Tow. At the time of the Allision, the Vessel and its Tow were navigating a course that required passage through six bridges within a one-mile stretch at night near Little Rock, Arkansas.

The Vessel's Captain, Anthony Treadwell ("Treadwell"), and Pilot, Patreon Hopkins ("Hopkins"), were unfamiliar with navigation on the Arkansas River, as this was their very first time navigating on this river. Hopkins was operating the Vessel at the time of the Allision. It was Hopkins's third day on the job with Marquette, and only his seventh month as a fully licensed pilot. Hopkins had never been permitted to stand watch alone before the evening of the Allision, and neither he nor Treadwell had been properly trained to identify potential risks and warnings specific to this or any section of the Arkansas River.[3]

In addition to inadequate training, Marquette failed to properly vet Hopkins during the hiring process to ensure he was qualified to pilot the Vessel. Had Marquette done so by asking even the most basic questions of a prospective vessel pilot during the interview process, the Allision would have been completely avoided. Instead, Marquette relied solely on unspecified, unknown training from Hopkins's former employer. Recognizing that Hopkins was a novice, Marquette did assign a corporate assessor, Brian Lowrance ("Lowrance"), to conduct a

---

[3] Standing watch alone means being solely responsible for navigating and operating a vessel without any experienced crew member present to supervise or assist.

navigational assessment of Hopkins during this voyage, to determine whether he could pilot the Vessel. However, at the time of the Allision, Hopkins was operating the Vessel without supervision, as Lowrance, the assessor tasked with monitoring Hopkins, was below deck, literally sleeping on the job.

There is no genuine dispute that this Allision was entirely avoidable and that its cause was well within the knowledge or privity of Marquette. As such, Marquette had both corporate knowledge and the ability to prevent the Allision, making it liable under governing admiralty law. Accordingly, summary judgment in favor of the COLR is warranted because Marquette cannot rebut the presumption of liability, nor can it obtain a limitation of liability under the governing statutes by claiming that the cause of the Allision was not within its knowledge or privity. As a result, the COLR is entitled to recover the full damages sought, plus recoverable prejudgment interest, which is universally awarded under admiralty law, absent exceptional circumstances, none of which exist here.

## II.    MATERIAL FACTS

The COLR incorporates its Local Rule 56.1 statement of facts as if set forth fully herein. For the convenience of the Court, a summary of the relevant material facts not in dispute is below.

### A.  The Clinton Pedestrian Bridge at MM 118.5

The COLR owns the Bridge at Mile Marker 118.2 on the Arkansas River in Little Rock, Arkansas. *See* Ex. 1, Hopkins Dep. 21:11-19, February 11, 2026; *see also* Ex. 2. There is no evidence that the Bridge or its protection cells were ever deemed an obstruction or hazard to navigation by any governmental authority or otherwise. *See* Ex. 3, McIntyre Dep. 177:24-178:10, February 5, 2026. Due to the function and presence of the Cell, the Bridge was not damaged as a result of the Allision. *Id.* at 305:24-25, 306:6-8. The Bridge is visually inspected daily. *See* Ex. 1,

Hopkins Dep. 17:22-18:19. In 1999, the Bridge was inspected by Garver Engineers, who determined that the Bridge was in very good condition and that a more detailed structural investigation or testing was not required. *Id.* at 27:24-28:3, 28:12-29:17; *see also* Ex. 4 at 2. It is established that the distance between the Bridge piers (and protection cells) provides adequate clearance for marine traffic. *See* Ex. 2.

**B. Marquette Transportation Company Gulf-Inland, LLC**

Marquette transports commodities by barge on the inland and western rivers in the United States. *See* Ex. 3, McIntyre Dep. 23:8-11, 26:19-22. Marquette is one of the largest inland vessel operators in the United States and has 65 vessels in its fleet. *Id.* at 23:12-13. Marquette employs 180 captains (including pilots and wheelmen), 350 deckhands, and 60 shoreside employees. *Id.* at 24:11-19, 21-23. The Arkansas River is one of the main rivers on which Marquette operates. *Id.* at 22:12-16.

Marquette's Port Captains are in charge of staffing the wheelhouse with a crew licensed to navigate the vessel. *See* Ex. 3, McIntyre Dep. 30:23-31:6. Marquette's Port Captains determine whether a navigational assessor is required on a vessel. *Id.* at 31:18-22. Port Captains are considered to be management employees of Marquette. *Id.* at 37:6-8. When a navigational assessor assesses a new-hire, they are doing so at the request of a Port Captain, Marquette's management. *Id.* at 37:21-38:12. Port Captains are part of Marquette's operations department, which is a part of Marquette's management. *Id.* at 158:18-21, 181:5-7. Marquette has no handbook for navigational assessors. *Id.* at 181:18-19.

**C. The I-30 Bridge at MM 118.2**

The I-30 bridge has two navigation channels. *See* Ex. 3, McIntyre Dep. 152:24-153:6. On October 22, 2020, the United States Army Corps of Engineers ("USACE") issued a notice to

mariners advising of construction near the I-30 bridge. *See* Ex. 5. On January 6, 2021, the United States Coast Guard ("USCG") issued a notice to mariners advising "Due to new pier work in the right descending channel, all navigation transiting the I-30 Bridge must now use the left descending channel span." *See* Ex. 6 at 13. On January 8, 2021, the USACE issued a notice to mariners advising "All upbound and downbound vessels must use the left descending channel span." *See* Ex. 7. On January 13, 2021, the USCG issued a notice to mariners advising "Due to new pier work in the right descending channel, all navigation transiting the I-30 Bridge must now use the left descending channel span." *See* Ex. 8 at 13-14.

Marquette and its mariners knew of the I-30 bridge and the location of its bridge piers in the navigable waterway. *See* Ex. 3, McIntyre Dep. 49:9-18. Marquette did not issue any safety alerts for the I-30. *Id.* at 152:14-23, 177:9-18. Despite knowing about the construction project near the I-30 bridge, the Vessel's crew did not have a safety meeting on this issue. *See* Ex. 9, Treadwell Dep. 78:10-79:21, July 11, 2025.

**D. Mariner Training and Policies and Procedures**

Marquette's policies and procedures require the preparation of an incident report for events that require reporting to the USCG. *See* Ex. 3, McIntyre Dep. 53:10-25; *see also* Ex. 10. Marquette does not have policies or procedures in place regarding the role and requirements of a navigational assessor. *See* Ex. 3, McIntyre Dep. 137:9-13, 139:5-9. Marquette's policies and procedures state that all incidents are preventable. *Id.* at 140:9-12; *see also* Ex. 11. Industry standards require more than just relying upon regulatory minimums of mariner licensure. *See* Ex. 3, McIntyre Dep. 114:13-16, 115:16-23, 116:15-20, 166:12-22. Marquette does not have a written policy requiring navigational assessments for new hires. *Id.* at 161:20-162:1. Marquette does not test new hires on its Safety Management System. *Id.* at 180:11-13. Marquette has the resources to locate local

notices to mariners issued by the USCG or the USACE. *Id.* at 229:13-235:16, 238:17-239:2. The maximum time a crewmember can be on watch is twelve hours in a twenty-four-hour period. *Id.* at 252:24-253:10; *see also* Ex. 12 at 3. Marquette does not have a policy on including assessors in boat logs. *See* Ex. 3, McIntyre Dep. 259:11-20.

### E.  The M/V Kieffer E. Bailey

The Vessel's Official No. is 1253271. *See* Ex. 13. The estimated fair market value of the Vessel on September 10, 2021, was $5,750,000.00. *See* Ex. 14 at 7. The Vessel was built in 2014. *See* Ex. 13. The Vessel is 78' long, its beam is 34', its air draft is 47', and its depth is 11'. *Id*. The Vessel is equipped with a Z-Drive propulsion system. *See* Ex. 3, McIntyre Dep. 59:15-17. *See* Ex. 13. The Vessel typically pushes 1 to 12 barges. *See* Ex. 3, McIntyre Dep. 61:9-12. In 2021, shoreside personnel communicated with the Vessel via email and phone. *Id.* at 62:2-10. Voyage risk assessments are supposed to be prepared before voyages, and there is no documentation substantiating that a voyage risk assessment was prepared before the Allision. *Id.* at 339:4-10, 339:22-340:1-3.

### F.  Captain Anthony Treadwell

Treadwell never operated a vessel on the Arkansas River before the Allision. *See* Ex. 9, Treadwell Dep. 15:20-16:3, 20:6-8; *see also* Ex. 3, McIntyre Dep. 119:8-16. Treadwell remained in the wheelhouse before the Allision because he had never operated a vessel on the Arkansas River and wanted to see the bridges. *See* Ex. 9, Treadwell Dep. 29:20-30:22; *see also* Ex. 3, McIntyre Dep. 120:3-8. Treadwell was upset that Marquette did not tell him that Hopkins never pushed more than six barges before the Allision. *Id.* at 182:18-23; *see also* Ex. 9, Treadwell Dep. 32:4-24. Treadwell was fired after the Allision for having a poor attitude. *See* Ex. 3, McIntyre Dep. 185:2-9; *see also* Ex. 9, Treadwell Dep. 11:10-16, 53:11-15.

### G. Pilot Patreon Hopkins

Marquette terminated Hopkins after his post-incident navigational assessment. *See* Ex. 3, McIntyre Dep. 89:14-18. There is no documented evidence that Marquette asked Hopkins about his previous experience piloting a vessel when hired or at any time before the Allision. *Id.* at 91:21-92:13. Marquette has no documented evidence whether Hopkins was interviewed to be hired by Marquette in person or by telephone. *Id.* at 99:21-23. Marquette did not complete the new-hire documentation regarding Hopkins' previous operational route and experience. *Id.* at 101:21-25, 103:1-3, 105:18-24; *see also* Ex. 16. Marquette has no documentation related to whether Hopkins was asked about his knowledge of vessel operations during the hiring process. *See* Ex. 3, McIntyre Dep. 106:13-17, 107:2-6. Marquette's employee file for Hopkins does not contain documentation substantiating that Hopkins had the proper credentials to serve as a pilot in the wheelhouse and operate the Vessel. *Id.* at 110:12-25, 111:19-23.

There is no evidence to substantiate that Marquette performed a reference check for Hopkins to verify his certificates/licenses and previous work experience pursuant to Marquette's own policies and procedures. *See* Ex. 3, McIntyre Dep. 314:2-316:20; *see also* Ex. 18. At the time of the Allision, Hopkins had been a Marquette employee for only three days. *See* Ex. 3, McIntyre Dep. 160:20-25. Marquette did not know whether Hopkins was a cut loose wheelman when he left his prior employer. *Id.* at 171:2-9, 175:23-25. Cut loose means a mariner has met the requirements of industry standards to operate a vessel. *Id.* at 176:1-12. Hopkins never stood a navigational watch on his own at his previous employer. *Id.* at 288:19-24; *see also* Ex. 19 at 9. At the time of the Allision, Hopkins held a mate pilot's license for 231 days or 7 months, 19 days. *See* Ex. 3, McIntyre Dep. 328:15-329:16; *see also* Ex. 20. A mate's pilot's license does not mean a mariner

has been cleared to operate a vessel alone/stand watch without supervision. *See* Ex. 9, Treadwell Dep. 34:16-35:5, 71:5-11.

### H. Navigational Assessor Brian Lowrance

The sole reason Brian Lowrance ("Lowrance") was on the Vessel was to perform a navigational assessment of Hopkins. *See* Ex. 15, Hopkins Dep. 28:4-10, June 15, 2025; *see also* Ex. 9, Treadwell Dep. 23:17-20. The industry standard is that a navigational assessor should be on duty when the person he is assessing is also on duty. *See* Ex. 3, McIntyre Dep. 124:1-12. At the time of the Allision, Lowrance was sleeping instead of performing a navigational assessment of Hopkins. *Id.* at 125:6-17; *see also* Ex. 21. It is a failure to meet the industry standard if the navigational assessor is sleeping as opposed to being awake while the person they are supposed to assess is operating the vessel. Ex. 3, McIntyre Dep. 128:24-129:9. The Vessel's daily vessel logs do not record what Lowrance was doing when he was on the vessel. *Id.* at 260:20-261:9; *see also* Ex. 22, Ex. 23, Ex. 24, Ex. 25.

### I. The Allision

The Allision occurred at night on September 10, 2021. *See* Ex. 19; *see also* Ex. 26. Hopkins was on watch. *See* Ex. 15, Hopkins Dep. 17:7-10.[4] At the time of the Allision, the Vessel was pushing 11 barges, 10 of which were fully loaded with wheat. *See* Ex. 26; *see also* Ex. 28; Ex. 3, McIntyre Dep. 72:14-20. The Tow's length was 800' excluding the Vessel. *See* Ex. 26; *see also* Ex. 28; Ex. 3, McIntyre Dep. 69:24-70:4. The Tow's width was 105'. *See* Ex. 26; *see also* Ex. 28; Ex. 3, McIntyre Dep. 154:5-6. The Tow allided with the I-30 bridge's protection cell and then broke free. *See* Ex. 26; *see also* Ex. 29; Ex. 30. The Tow then broke free from the Vessel and

---

[4] The term on watch means on duty. *See* Ex. 3, McIntyre Dep. 251:11-14, 254:4-13.

allided with the Bridge's Cell, causing significant damage. *See* Ex. 29; *see also* Ex. 30; Ex. 26. The Tow's lead barge was damaged as a result of the Allision. *See* Ex. 31.

The pending freight (freight charges) for the Vessel's voyage was $150,918.48. *See* Ex. 32. At the time of the allision, the current was slack, meaning a routine state. *See* Ex. 3, McIntyre Dep. 188:8-16; *see also* Ex. 26. The vessel was moving at 5.1 mph when the Tow allided with the I-30 protection cell. *See* Ex. 33; *see also* Ex. 3, McIntyre Dep. 269:5-8. The river stage was at 7.06, a normal stage for the Arkansas River. *See* Ex. 26; *see also* Ex. 3, McIntyre Dep. 269:23-25. The Tow and Vessel were not properly aligned while navigating the I-30. *See* Ex. 3, McIntyre Dep. 272:16-22.

## J. After the Allision

After the Allision, Marquette prepared an incident report pursuant to its Shoreside Operations Manual 5.2. Ex. 3, McIntyre Dep. 144:11-15; *see also* Ex. 34; Ex. 19. Eight days after the allision, Marquette employee Leo Wardlaw ("Wardlaw") performed a navigational assessment of Hopkins. *See* Ex. 35; *see also* Ex. 3, McIntyre Dep. 207:9-11. Parts of Wardlaw's assessment of Hopkins were dismal. *Id.* at 130:11-15. Wardlaw determined that Hopkins was not very well-versed in running a vessel. *Id.* at 208:20-209:5; *see also* Ex. 35. Wardlaw determined that Hopkins was "not experienced with more than six barges," something Marquette could and should have known before the allision. *See* Ex. 3, McIntyre Dep. 209:6-11, 209:25-210:11; *see also* Ex. 35. It is common practice to contact a mariner's prior employer to vet them, and there is no reason why Marquette could not have done so for Hopkins. *See* Ex. 3, McIntyre Dep. 210:12-211:2.

Wardlaw also determined that Hopkins, "Doesn't communicate when necessary in a timely manner." *See* Ex. 3, McIntyre Dep. 188:8-16; *see also* Ex. 35. Wardlaw determined that Hopkins, "Doesn't understand when he's getting into a situation." *See* Ex. 3, McIntyre Dep. 212:21-213:12;

*see also* Ex. 35. Wardlaw determined that Hopkins "does not at all use or understand radar." *See* Ex. 3, McIntyre Dep. 221:1-13; *see also* Ex. 35. Wardlaw determined that Hopkins "does not understand how current works." *See* Ex. 3, McIntyre Dep. 221:14-222:17, 225:15-23; *see also* Ex. 35. Wardlaw determined that Hopkins, "Struggles to make locks, can't judge distance." *See* Ex. 3, McIntyre Dep. 226:6-11; *see also* Ex. 35. Wardlaw determined, "It is my good judgment that Patreon needs a lot of work. Says he was a pilot mate but clearly has not stood many watches alone." *See* Ex. 3, McIntyre Dep. 227:15-228:12; *see also* Ex. 35.

### K.  The COLR's Damages

After the Allision, the COLR retained Volkert, a local engineering company, to assess the damaged Cell. The cost for this work totaled $5,625.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 8. On March 11, 2025, the COLR retained HNTB Corporation to provide preliminary design and engineering services for a replacement protection cell; these preliminary services cost $49,975.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 9. On August 19, 2025, the COLR entered into a supplemental contract with HNTB Corporation for full design and engineering services for a replacement protection cell, increasing the original contract by $712,441.00, for a revised total of $762,416.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 10.

On February 21, 2025, the COLR retained Massman Construction Company to perform preconstruction services for a replacement protection cell for a cost of $49,500.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 11. On November 25, 2025, the COLR and Massman Construction Company executed Change Order #1 to place an order for sheet pilings to meet the manufacturer's rolling schedule and delivery to the COLR by early March 2026, increasing the contract amount by $527,700.00, for a revised total of $577,200.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 12. On December 4, 2025, the COLR and Massman Construction Company

executed Change Order #2 to provide for the demolition, removal, and disposal of the damaged Cell at the Bridge, increasing the contract amount by $2,150,000.00, for a revised total of $2,727,200.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 13. On January 21, 2026, the COLR and Massman Construction Company executed Change Order #3 to provide for the construction of the replacement cell for the Bridge, increasing the contract amount by $3,046,577.00, for a revised total of $5,774,154.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 14. As of the date of this filing, the total damage the COLR will incur to replace the Bridge's Cell damaged because of the Allision is $6,542,195.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 15.

## III.   LEGAL STANDARD

Summary judgment is appropriate when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must draw all reasonable inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

## IV.   ARGUMENT

### A. Marquette is Presumptively Negligent and Liable for the Allision

#### i.   *The Oregon Rule Applies*

Under general maritime law, a negligence claim requires a plaintiff to show that the defendant owed a duty of care, breached that duty, and that the breach caused damages. A duty of care exists when an injury is reasonably foreseeable, which is determined by "examin[ing] and weigh[ing] the probability of an accident, the potential extent of the injury, and the cost of adequate

precautions." *See Nieves v. Cooper Marine & Timberlands Corp.*, No. 3:15CV00350 JLH, 2018 WL 1855953, at *9 (E.D. Ark. Apr. 18, 2018) (quoting Schoenbaum, at § 5-2.). Here, Marquette owed a duty to navigate safely and avoid collisions with stationary structures, which is a reasonably foreseeable event. Because the Vessel's Tow allided with the I-30 protection cell, a stationary structure, the *Oregon Rule* applies, and the moving Vessel is presumed at fault. *See The Oregon*, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895).

This presumption shifts the burden to the Vessel to prove that the Allision occurred without its negligence, was caused by the fault of the stationary object, or resulted from an inevitable accident. *Id.*[5] "In admiralty, this presumption does more than merely require the ship to go forward and produce some evidence on the presumptive matter." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977) (quoting *Patterson Terminals, Inc. v. S/S Johannes Frans*, 209 F.Supp. 705, 707 (E.D.Pa.1962)). "The moving vessel must show that it was without fault or that the collision was occasioned by fault of the stationary object or was the result of inevitable accident." *Id*.

The I-30's protection cells exist to protect the I-30's piers from vessel or barge impacts. There is no evidence that the I-30, its bridge piers, or its protection cells were ever considered an obstruction or hazard to navigation, or that they impaired the navigable channel before the Allision. Any claim that construction staging or lights contributed to or caused the Allision is unavailing. On January 6, 2021, the USCG issued notices to mariners regarding the construction, "I-30 Bridge; Due to new pier work in the right descending channel, all navigation transiting the I-30 Bridge must now use the left descending channel span." *See* Ex. 6 at 13. On January 13, 2021, the USCG

---

[5] Under the *Oregon Rule* analysis, the term "vessel" refers to the vessel as an operating unit, including its crew and its mechanical components.

issued another notice stating the same. *See* Ex. 8 at 14. The USACE also issued a notice on October 22, 2020:

> Mariners are advised that the scheduled completion date for the work(noted in Nav Notice SWL 20-44) on the left descending pier protection cell for the Interstate-30 Bridge at NM 118.5 in Little Rock has been extended to Feb 22, 2021. Crews are working from 6 a.m. to 6 p.m. daily and a work/crane barge will be positioned outside of the navigation channel, upstream of the left descending pier protection cell. As indicated in Nav Notice SWL 20-26, all downbound vessels are directed to use only the right main navigation span until the pier protection cell has been replaced and upbound vessels may continue using either navigation span. Mariners may contact the onsite workboat, M/V Ray Pensrum, on VHF-FM channel 13 or 16.

*See* Ex. 5 at 2. The USACE issued another notice on January 8, 2021:

> The U.S. Coast Guard has advised that effective Jan 5, the I-30 Bridge right descending channel span is closed due to contractors working on a new bridge pier. All upbound and downbound vessels must use the left descending channel span. The work on the upstream left descending pier protection cell is complete.

*See* Ex. 7 at 2. These notices provided Marquette with sufficient information to plan accordingly to navigate safely, but Marquette failed to do so.[6] *See Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987, 1002 (E.D. La. 2000) ("His failure to learn of the presence of the submerged obstruction by consulting current charts and Notices to Mariners was negligent."). There is no factual basis to attribute the Allision to the I-30's protection cell or construction-related activities.[7]

    *ii.    Liability Extends to the Tow*

Under maritime law, a vessel remains responsible for the navigational consequences of any tow under its control, even if the tow subsequently breaks free. Liability attaches because the tow is considered an extension of the vessel, and the vessel owes a duty to ensure that it is properly secured and navigated. Courts have consistently held that when a vessel can control a tow, the

---

[6] Marquette has the resources to locate local notices to mariners issued by the USCG or the USACE. *See* Ex. 3, McIntyre Dep. 229:-235:16, 238:17-239:2.

[7] Voyage risk assessments are supposed to be prepared before voyages, and there is no documentation substantiating that a voyage risk assessment was prepared before the Allision. *See* Ex. 3, McIntyre Dep. 339:4-10, 339:22-340:1-3.

vessel owner or operator bears responsibility for any damage caused by the tow's uncontrolled movement. The general rule is that "[w]hen an unmanned barge strikes a stationary object such as a dolphin[,] ... the custodian of the barge has the burden to prove that his negligence was not a proximate cause of the allision." *See Pillsbury Co. v. Midland Enters., Inc*., 715 F.Supp. 738, 758 (E.D. La. 1989) (citing *Koch-Ellis Marine Contractors v. Sewerage & Water Bd. Of New Orleans*, 218 F.2d at 772 & n.3 (5th. Cir. 1955) ), aff'd, 904 F.2d 317 (5th Cir. 1990); *see also Entergy Mississippi, Inc. v. Marquette Transportation Co., L.L.C*., 742 F. App'x 800, 802–03 (5th Cir. 2018). Here, the Tow that became separated from the Vessel remains legally attributable to the Vessel because it was under the Vessel's operational control at the time of the Allision, and the Vessel had a continuing duty to prevent such incidents. As a result, liability for the Allision extends to the Vessel for any harm caused by the Tow, even if the Tow itself detached.

    *iii.*    *The I-30 Protection Cell is a Lawful Stationary Object*

Even if Marquette attempts to argue that factors other than its own negligence caused the Allision, such arguments fail as a matter of law. There is no evidence that the I-30's protection cells or piers were an obstruction or hazard, and all construction-related notices ensured prudent navigation was possible. *See* Ex. 5; *see also* Ex. 6; Ex. 7; Ex. 8.[8] Because the Vessel bears the burden to establish either the fault of the stationary structure or an inevitable accident, and cannot do so, the presumption of fault remains unrebutted.[9] The Court should conclude that the Vessel is liable as a matter of law under the *Oregon Rule*.

---

[8] Marquette and its mariners knew of the I-30 and the location of its bridge piers in the navigable waterway. *See* Ex. 3, McIntyre Dep. 49:9-18. Marquette did not issue any safety alerts for the I-30. *Id.* at 152:14-23, 177:9-18.

[9] *See The Louisiana*, 70 U.S. 164, 174, 18 L. Ed. 85 (1865) (The court determined the appellant failed to show that the collision was the result of an inevitable accident); *The Clarita*, 90 U.S. 1, 13, 23 L. Ed. 146 (1874); *The Oregon*, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895); *see also City of Chi. v. M/V Morgan,* 248 F.Supp.2d 759, 779 (N.D.Ill.2003)(The court rejected the inevitable accident argument where the crew could have prevented the allision).

### B. Marquette Cannot Rebut the Presumption of Liability

#### i.   *The Vessel Did Not Act Without Fault*

Even if Marquette attempts to rebut the presumption of fault under the *Oregon Rule*, the evidence demonstrates that it cannot establish that the Allision occurred without negligence. The pilot in command of the Vessel, Hopkins, was inexperienced on the Arkansas River, as this was his very first trip navigating on the river. Hopkins was not sufficiently trained on the complexities of the Arkansas River, particularly for this section containing six bridges in close proximity to one another, including the proper handling of the Vessel and Tow near bridge protection structures.[10] This was also the first time Hopkins ever operated a vessel pushing more than six barges. *See* Ex. 35. Moreover, Marquette failed to provide adequate supervision to this brand-new hire. Lowrance was assigned to monitor and assess Hopkins's performance, but, incredibly, at the time of the Allision, he was asleep.[11] *See* Ex. 21. This lack of oversight,[12] in addition to Hopkins's inexperience and lack of training, directly contributed to the unsafe navigation, causing the Allision.[13] Taken together, or even individually, Hopkins's inexperience, inadequate training, and lack of supervision demonstrate that the Vessel failed to act with due care. These factors are sufficient to establish fault, and they defeat any attempt to invoke the "without negligence exception" to the *Oregon Rule* presumption. *See Brunet v. United Gas Pipeline Co.*, 15 F.3d 500,

---

[10] *See Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1577 (11th Cir. 1985) (Vessel owner failed to establish that it did not have actual knowledge of the crew's negligence and conditions of unseaworthiness or, in the alternative, failed to prove that it could not have obtained the information); *see also In Matter of Complaint of Warrior & Gulf Navigation Co.*, No. CIV.A. 94-0323-AH-S, 1996 WL 904752, at *9 (S.D. Ala. Nov. 13, 1996) *("Henry Marine's reliance on others to train its crew for it represents negligent manning of the vessel.")*.

[11] The industry standard is that a navigational assessor is supposed to be on duty when the person he is assessing is also on duty. *See* Ex. 3, McIntyre Dep. 124:1-12.

[12] The M/V Kieffer E. Bailey's daily vessel logs do not show what Lowrance was doing when he was on the vessel. *See* Ex. 22; *see also* Ex. 23; Ex. 24, Ex. 25; Ex. 3, McIntyre Dep. 260:20-261:9.

[13] *See The Oregon*, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895).

505 (5th Cir. 1994).[14] Liability properly attaches to the Vessel, and the presumption of fault remains unrebutted.

      *ii.*    *The Allision Was Not Caused by the Stationary I-30 Protection Cell*

There is absolutely no evidence that the well-known to Marquette and stationary I-30 protection cell somehow caused the Tow to impact it and caused the Tow to break free from the Vessel and subsequently allide with the Cell. There is no evidence that the I-30 protection cell was in any way unlawful, improperly placed, or caused the Allision. Nothing in the record indicates that the I-30 protection cell obstructed navigation or created a hazard before the Allision.[15] In fact, both the USCG and USACE issued notices to mariners regarding construction staging near the I-30, providing vessel operators with ample and timely guidance to navigate safely.[16] Any argument that the construction or staging contributed to the Allision is therefore unsupported by the record.

      *iii.*    *The Allision was not Unavoidable*

Any claim that the Allision was an unavoidable incident fails as a matter of law. The Vessel was operating in a controlled navigable channel, the I-30's protection cell was lawful, properly placed, and clearly marked and in place for years and well known to Marquette. The Allision occurred at night, yet Hopkins had never stood his own watch on the Arkansas River and had no prior experience navigating past the six bridges along this one-mile stretch.[17] Given these circumstances, along with Hopkins's inadequate training and the lack of proper supervision, the risk of an allision was entirely foreseeable. These facts demonstrate that the Allision was not inevitable, but instead resulted from predictable factors. *See The Louisiana*, 70 U.S. 164, 174, 18

---

[14] *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977) (quoting *Patterson Terminals, Inc. v. S/S Johannes Frans*, 209 F.Supp. 705, 707 (E.D.Pa.1962)) ("The moving vessel must show that it was without fault or that the collision was occasioned by fault of the stationary object or was the result of inevitable accident."). *Id*.

[15] The I-30 has two navigation channels. Ex. 3, McIntyre Dep. 152:24-153:6.

[16] *See* Ex. 5; *see also* Ex. 6; Ex. 7; Ex. 8.

[17] *See* Ex. 15, Hopkins Dep. 12:11-16.

L. Ed. 85 (1865) (The court determined the appellant failed to show that the collision was the result of an inevitable accident); *The Clarita*, 90 U.S. 1, 13, 23 L. Ed. 146 (1874); *The Oregon*, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895); *see also City of Chi. v. M/V Morgan,* 248 F.Supp.2d 759, 779 (N.D.Ill.2003) (The court rejected the inevitable accident argument where the crew could have prevented the allision). There is no evidence that conditions with the I-30 bridge, the river, or otherwise, made the Allision unavoidable,[18] and the Vessel cannot escape liability under the *Oregon Rule*.

      iv.    *Causation: The Force of the Allision Caused the Damages at Issue.*

Marquette may argue that the allision was minor and that the Cell was damaged beyond repair, due to instability caused by scour that removed layers of overburden (sand and soil) around the Cell, and because the COLR failed to maintain the Cell. However, the evidence demonstrates that the Allision constituted a massive, direct impact that would have displaced the Cell regardless of the level of embedment in overburden. *See* Ex. 31. The Tow struck the Cell in a direct hit, not a glancing or incidental contact, imparting energy sufficient to topple the structure and significantly damage Marquette's lead barge. *Id*. The presence or absence of overburden surrounding the Cell is immaterial because the magnitude and nature of the impact were the sole proximate cause of the Cell toppling. In fact, the Cell functioned exactly as designed, effectively absorbing the impact of the Allision, as evidenced by the fact that the Bridge pier sustained no damage.[19] *See* Ex. 3, McIntyre Dep. 305:24-25, 306:6-8. Given the severity of this Allision, even

---

[18] At the time of the allision, the current was in a slack state, which means a routine state. *See* Ex. 3, McIntyre Dep. 188:8-16; *see also* Ex. 26.

[19] There is no evidence that the Bridge or its protection cells were ever deemed an obstruction or hazard to navigation. *See* Ex. 3, McIntyre Dep. 177:24-178:10. The Bridge was not damaged because of the Allision. *Id.* at 305:24-25, 306:6-8.

if the Cell was in an as-new condition with full overburden embedment, it would have been damaged beyond repair by the same direct impact.

Attached as Exhibit 38 is the expert report of Justin Kestner, P.E., an engineering expert who has extensive experience in civil engineering and marine protection cell structural failure and damage analysis, together with his accompanying Declaration, which authenticates the expert report and supporting materials. In his report, Kestner addresses Marquette's likely arguments that the alleged lack of overburden, design, and inadequate maintenance were causes of the damage, and he demonstrates through detailed analysis and calculations that such arguments are not scientifically founded. *Id.* His opinion confirms that the Cell was upright, unmoved, and in good condition before the Allision and fulfilled its function, protecting the Bridge. *Id.* He further opines that even if the Cell was in its original new condition with full overburden, it would have been knocked over because of the severity of this significant head-on collision. *Id.* Accordingly, Marquette's anticipated argument that insufficient overburden, inadequate design, or lack of maintenance caused the damages arising out of this Allision is unsupported by the record and refuted by documented scientific calculation.  As such, this argument does not create a genuine dispute of material fact as to causation.

### C. Marquette is not Entitled to Limit its Liability

#### i. *Legal Standard for Limitation of Liability Under Admiralty Law*

Under the Limitation of Liability Act, a vessel owner may limit its liability only if the loss occurred without the owner's knowledge or privity. Knowledge or privity exists when the owner knew, or through reasonable diligence should have known, of negligent or reckless acts that caused the loss. Courts have repeatedly held that limitation is unavailable when the owner had actual knowledge of, or was complicit in, the negligent conduct leading to the incident. *See Vulcan*

*Materials Co. v. Massiah*, 645 F.3d 249, 255 (4th Cir. 2011) (The District Court's Judgment was Affirmed) (Observing that a shipowner seeking limitation of liability bears the burden of proving a lack of privity or knowledge). Marquette cannot meet its burden of showing that the cause of the Allision was not within Marquette's knowledge or privity. Here, Marquette's management knew, or it should have known, about Hopkins's general inexperience on the Arkansas River, pushing eleven barges, and his lack of watch-standing experience, and Lowrance's failure to supervise Hopkins as opposed to sleeping, placing the Marquette firmly within the scope of knowledge or privity and precluding limitation.

    ii.    *Marquette had Knowledge or Privity*

Marquette knew or should have known about Hopkins's inexperience generally and on the Arkansas River specifically. Marquette knew or should have known that Hopkins was inadequately trained. Marquette knew or should have known that Hopkins had never pushed more than six barges in the past. And Marquette failed to provide the necessary supervision when he needed it most.  Individually, these failures prohibit the application of a limitation of liability, but collectively, it is not even close. Marquette knew or should have known that this was Hopkins's very first time navigating a vessel on the Arkansas River and that this dramatically increased the risk of an Allision unless he was properly supervised. Marquette also knew, or should have known, that Hopkins had no watch-standing experience, because he never stood his own watch before this voyage. *See* Ex. 19 at 9. This is also a red flag, which should have been known to Marquette.  It seems that, at least to some degree, Marquette failed to recognize that Hopkins required oversight as he was brand-new to the company.  Because of this, Marquette assigned Lowrance as Hopkins' assessor for this voyage. Surprisingly, Marquette has absolutely no policies or procedures defining the navigational assessor's role or simply mandating that the assessor is to coordinate his schedule

19

with that of the person being assessed. Here, this failure, among others, led to the assessor being asleep when the person he was to assess was in the wheelhouse, operating the Vessel, unsupervised at night, in a challenging part of the Arkansas River for the very first time, pushing more barges than he ever had before.[20]

A vessel owner has a duty to use "due and proper care" to provide a competent crew. *See In re Complaint of Messina*, 574 F.3d 119, 127 (2d Cir. 2009) (citing *Tug Ocean Prince*, 584 F.2d at 1155; *Guglielmo*, 897 F.2d at 61). Courts have consistently held that when a vessel owner or operator has actual knowledge of reckless or negligent conduct by its crew, limitation of liability under 46 U.S.C. § 30505 is barred. *See Farrell Lines*, 530 F.2d at 10; *Pennzoil*, 943 F.2d at 1473-74; *China Union Lines, Ltd. v. A. O. Andersen & Co.*, 364 F.2d 769, 787 (5th Cir. 1966). When an owner entrusts the operation of his vessel to an inexperienced person, he destroys any argument he might have had for limitation of his liability. *See In re Complaint of Messina*, 574 F.3d 119, 127 (2d Cir. 2009)(citing *Tug Ocean Prince*, 584 F.2d at 1159). Here, Marquette's decision to place an inexperienced pilot on a complex nighttime bridge transit without adequate supervision is a management failure that made the Allision foreseeable.[21] This direct knowledge of unsafe conditions demonstrates that Marquette cannot rely on limitation, and full liability properly attaches.

---

[20] *See* Ex. 35; *see also* Ex. 3, McIntyre Dep. 125:6-17. It is a failure of the industry standard for the navigational assessor to be sleeping as opposed to awake while the person they are supposed to be assessing is operating the vessel. *Id.* at 128:24-129:9.

[21] A vessel owner is not entitled to limited liability as a matter of law merely because he subjectively believed the person he has allowed to operate his craft was competent. "[I]gnorance of a reason to suspect incompetence is not enough.... [I]t is not enough for a boat owner to harbor a subjective belief that an operator is competent. That belief must be based on evidence of competence that renders the belief objectively reasonable." *In re Complaint of Messina*, 574 F.3d 119, 127 (2d Cir. 2009) (quoting *Guglielmo*, 897 F.2d at 62; see, e.g., id. at 61 ("Boat owners may not assume that would-be operators are competent until proven otherwise.")).

     *iii.*    *Treadwell and Hopkins were inadequately experienced, rendering the vessel unseaworthy.*

The Vessel was unseaworthy at the time of the Allision because it was under the control of an incompetent crew. Hopkins[22] lacked the necessary experience to serve as a pilot, having failed to complete a navigational trip on the Arkansas River within the 60 months leading up to the Allision. Treadwell,[23] was also unfamiliar with this segment of the river and failed to complete a navigational trip on the Arkansas River within the 60 months leading up to the Allision. This combination of Hopkins's inexperience and Treadwell's unfamiliarity creates an inherently unsafe condition, directly contravening regulatory safety requirements designed to ensure competent vessel operation, and creates a foreseeable risk of an allision within the knowledge or privity of Marquette while at the same time rendering the Vessel unseaworthy. *See* 46 C.F.R. § 15.812 (Requires mariners to have one round-trip within the past 60 months on the waters on which they will operate a vessel).

Both Treadwell and Hopkins testified that this was their first time on the Arkansas River, substantiating that neither would have met the regulatory requirement of one trip within the 60 months preceding the Allision. *See* Ex. 9, Treadwell Dep. 15:20-16:3, 20:6-8; *see also* Ex. 3, McIntyre Dep. 119:8-16; Ex. 15, Hopkins Dep. 12:11-16. A vessel being operated by an incompetent captain or crew is considered unseaworthy. *See In re Complaint of Messina*, 574 F.3d 119, 127 (2d Cir. 2009); *see also Potomac Transport, Inc. v. Ogden Marine, Inc.,* 909 F.2d at 47; *Guglielmo,* 897 F.2d at 61; *Tug Ocean Prince*, 584 F.2d at 1155 (emphasis added). As a result of Marquette's decisions, the Vessel was exposed to heightened risks of navigational error due to the

---

[22] At the time of the Allision, Hopkins held a mate pilot's license for 231 days or 7 months, 19 days. *See* Ex. 3, McIntyre Dep. 328:15-329:16; *see also* Ex. 20.
[23] *See* Ex. 9, Treadwell Dep. 20:6-8.

inexperience of Treadwell and Hopkins, rendering it incapable of safe operation, and this Allision event was entirely foreseeable, precluding limitation.

> iv. *Marquette failed to vet and train Hopkins, barring the application of the limitation of liability.*

Limitation of liability is unavailable when the vessel owner had knowledge or privity of negligent acts. Here, Marquette's management failed to properly vet Hopkins during the hiring and interview process, relying solely on unspecified prior training or unknown experience from a former employer.[24] *See Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp*., 768 F.2d 1558, 1577 (11th Cir. 1985) (Vessel owner failed to establish that it did not have actual knowledge of the crew's negligence and conditions of unseaworthiness or, in the alternative, failed to prove that it could not have obtained the information). There is no documented evidence that Marquette asked Hopkins about his previous experience piloting a vessel. *See* Ex. 3, McIntyre Dep. 91:21-92:13. No inquiries were made to confirm Hopkins's actual qualifications, watch-standing experience, or familiarity with this portion of the river.[25] Hopkins was then placed on a difficult night voyage with no training or oversight. And the assessor assigned by Marquette was asleep at the most critical time when he was needed most, when Hopkins was transiting six bridges in proximity with known construction at the I-30 bridge at night.

Courts have consistently held that a failure to exercise due diligence in hiring and training a crew member can constitute knowledge or privity, barring limitation. S*ee In Matter of Complaint of Warrior & Gulf Navigation Co.*, No. CIV.A. 94-0323-AH-S, 1996 WL 904752, at \*9 (S.D. Ala.

---

[24] It's common practice to contact a mariner's prior employee to vet them, and there is no reason why Marquette could not have done so for Hopkins. *See* Ex. 3, McIntyre Dep. 210:12-211:2.

[25] There is no evidence to substantiate that Marquette performed a reference check for Hopkins to verify his certificates/licenses and previous work experience pursuant to Marquette's own policies and procedures. *See* Ex. 3, McIntyre Dep. 314:2-316:20; *see also* Ex. 18. At the time of the Allision, Hopkins had been a Marquette employee for just three days. *See* Ex. 3, McIntyre Dep. 160:20-25. Marquette did not know whether Hopkins was a cut loose wheelman when he left his prior employer. *Id.* at 171:2-9, 175:23-25.

Nov. 13, 1996) ("The negligence of the crew of the MARY SUE was within the privity and knowledge of Henry Marine in part because it contributed to such negligence through its lack of adequate training of the crew.").[26]

A subsequent assessment of Hopkins revealed shockingly deficient skills and a lack of knowledge of vessel operation, underscoring the foreseeability of the Allision. After the Allision, Wardlaw, a Marquette employee, conducted a ride-along assessment of Hopkins. The results were astonishing. Wardlaw reported that Hopkins was simply unable to read the river current, which is an essential skill for a pilot. *See* Ex. 35. Wardlaw also reported that Hopkins could not properly operate the radar or communicate effectively with the vessel crew. *Id*. Additionally, Hopkins's prior experience was limited to pushing only six barges. *Id.* On the night of the Allision, Marquette placed Hopkins in a position where he was responsible for pushing eleven barges, *nearly double his prior experience, through six bridges at night*. These stark deficiencies demonstrate that Hopkins was unqualified for the voyage and that Marquette's decision to place him in control constituted an abject failure of Marquette's judgment.

Marquette determined through an investigation of the Allision that Hopkins had never stood watch before this Allision, something Marquette easily could have determined if his onboarding had been done properly. *See* Ex. 19 at 9.[27] Hopkins was subsequently terminated.[28] This post-Allision evidence, specifically Wardlow's grim assessment, confirms that Marquette had actual or constructive knowledge of the risk, precluding any claim for a limitation of liability.[29]

---

[26] "Had Henry Marine properly investigated Blakeny's past record as a pilot, it would have been aware of his incompetence in his field." *In Matter of Complaint of Warrior & Gulf Navigation Co.*, No. CIV.A. 94-0323-AH-S, 1996 WL 904752, at *11 (S.D. Ala. Nov. 13, 1996).

[27] Hopkins never stood a navigational watch on his own at his previous employer. *See* Ex. 3, McIntyre Dep. 288:19-24; *see also* Ex. 19 at 9.

[28] Marquette terminated Hopkins after his post-incident navigational assessment. *See* Ex. 3, McIntyre Dep. 89:14-18.

[29] *See Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1577 (11th Cir. 1985) (Vessel owner failed to establish that it did not have actual knowledge of the crew's negligence and conditions of unseaworthiness or, in the alternative, failed to prove that it could not have obtained the information); *see also In*

     *v.    Marquette Failed to Supervise Hopkins, and its Corporate Representative was Negligent.*

Marquette's oversight of the Vessel was inadequate because the assigned navigational assessor, Lowrance, was asleep while the inexperienced Hopkins operated the Vessel alone. Marquette will likely argue that Treadwell was with Hopkins at the time of the Allision. Although Treadwell was physically present in the wheelhouse, he was off duty,[30] did not know how poorly trained or inexperienced Hopkins was, and was merely observing the transit, as he too had never navigated this section of the river. *See* Ex. 9, Treadwell Dep. 29:20-30:22; *see also* Ex. 3, McIntyre Dep. 120:3-8. The combination of an unsupervised, inexperienced pilot and an off-duty captain with no familiarity with the Arkansas River created a foreseeable risk of an allision. Marquette's failure to ensure competent supervision or to account for Hopkins's lack of experience rendered the Vessel unseaworthy and underscores that the Allision was entirely preventable and further precludes any claim for application of a limitation of liability.[31]

     *vi.    Reasonable Precautions Would Have Prevented the Allision.*

Marquette's policies and procedures state that all incidents are preventable. *See* Ex. 37. Marquette's "Mission Zero" is a commitment to zero accidents, zero injuries, and zero spills. *Id.* The absence of a documented pre-voyage risk assessment, failure to verify and evaluate a new pilot's competencies, and the assessor's absence from the watch contravene these commitments

---

*Matter of Complaint of Warrior & Gulf Navigation Co.,* No. CIV.A. 94-0323-AH-S, 1996 WL 904752, at *9 (S.D. Ala. Nov. 13, 1996) ("Henry Marine's reliance on others to train its crew for it represents negligent manning of the vessel.").

[30] The maximum time a crewmember can be on watch is twelve hours in a twenty-four-hour period. *See* Ex. 3, McIntyre Dep. 252:24-253:10; *see also* Ex. 12

[31] "Red Star's management knew of Reimer's lack of experience on the Hudson River, knew of the conditions to be encountered, knew that he would stand night watches, clearly failed in its duty to exercise due diligence and sent out a ship unseaworthy because not properly manned under the existing conditions." *See Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1157 (2d Cir. 1978).

and further confirm Marquette's negligence. Additionally, Marquette has no policies on the role and requirements of a navigational assessor.[32]

Attached as Exhibit 39 is the expert report of Captain John Sutton, a maritime navigation expert with over 44 years of experience in vessel operations and collision and allision analysis, together with his accompanying Declaration, which authenticates the report and supporting materials. In his report, Captain Sutton analyzes the circumstances leading to the Allision. He opines that the Allision resulted from failures in Marquette's managerial decisions, inadequate vetting of Hopkins, careless vessel operation, poor crew oversight, and failure to follow industry standards and navigation procedures within Marquette's knowledge or privity. The report and declaration together demonstrate that these deficiencies were foreseeable and prevent Marquette from limiting its liability, as the Allision was caused by conditions for which Marquette, not simply the crew, bears responsibility. Marquette failed to take any reasonable precautions, vetting, or training Hopkins, or to ensure the Vessel was staffed with a competent crew, barring Marquette from seeking application of a limitation of liability as the cause of the Allision was within its knowledge or privity.

### D. Recovery of Full Damages and Prejudgment Interest Is Warranted

*i.   The COLR's Full Damages are Recoverable Under Admiralty Law*

Courts have consistently held that when a tow under a vessel's control causes damage, the vessel owner is liable for that damage, even if the tow subsequently detaches.[33] Here, the Allision was the natural and foreseeable consequence of Marquette's conscious decision to take

---

[32] Marquette does not have policies or procedures in place regarding the role and requirements of a navigational assessor. *See* Ex. 3, McIntyre Dep. 137:9-13; 139:5-9.

[33] *See Pillsbury Co. v. Midland Enters., Inc.*, 715 F.Supp. 738, 758 (E.D. La. 1989) (citing *Koch-Ellis Marine Contractors v. Sewerage & Water Bd. Of New Orleans*, 218 F.2d at 772 & n.3 (5th. Cir. 1955) ), aff'd, 904 F.2d 317 (5th Cir. 1990); *see also Entergy Mississippi, Inc. v. Marquette Transportation Co., L.L.C.*, 742 F. App'x 800, 802–03 (5th Cir. 2018).

unnecessary risks, making Marquette fully responsible for the resulting damage. But for the Cell absorbing the impact, it is entirely likely that the Bridge's pier itself could have been severely damaged or destroyed, leading to catastrophe. This Allision was the predictable outcome of Marquette's management choices.

### ii.   *Damages Incurred by the COLR*

As a direct result of the Allision, the Cell was damaged beyond repair. The Tow involved consisted of eleven barges, ten of which were fully loaded, and was 800' in length, and its width was 105'.[34] The Tow weighed between 14,963 tons and 19,198 tons, a massive weight, which allided with the Cell, causing extensive structural damage that cannot be repaired, necessitating full replacement. *See* Ex. 38, Declaration of Justin Kestner at 18-20. The USCG instructed the COLR to replace the Cell because of this damage. *See* Ex. 40. The COLR's damages include costs for preconstruction engineering services, demolition, removal, mobilization of construction crews, procurement of necessary materials, and replacement of the Cell. The total cost the COLR will incur to replace the damaged Cell is $6,542,195.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 15.

The full removal costs are recoverable as the USCG has now mandated the Cell be removed. *See* Ex. 40; *see also Kansas City S. Ry. Co. v. Barge HBC 8106,* 642 F. Supp. 609, 613 (W.D. La. 1986) ("Because the U.S. Coast Guard required that the damaged bridge be removed, Appendix ¶ 19, the total cost in the amount of $607,136.00, reasonably incurred by plaintiff in removing the bridge structure is properly recoverable.") (*citing United States v. State Road Department of Florida,* supra, 189 F.2d at 596*); See also Brunet v. United Gas Pipeline Co*., 15 F.3d 500, 505 (5th Cir. 1994).

---

[34] The Tow's length was 800' excluding the Vessel. *See* Ex. 26; *see also* Ex. 3, McIntyre Dep. 69:24-70:4. The Tow's width was 105'. *Id.* at 154:5-6; *see also* Ex. 26.

The COLR also submits the Declaration of David Hopkins, attached as Exhibit 36, which authenticates and attaches the contracts and supplementary contracts, governing the work at issue, as well as the related change orders. Also attached to his Declaration are the work plans for the scope of work necessary to remove and replace the damaged Cell. These documents establish the scope of the work to be performed and the amounts the COLR has incurred and will incur to replace the damaged Cell. As outlined in the attached contracts, supplemental contracts, and change orders, the costs reflected therein were necessary to address the damages caused by the Allision and provide documentary support for the COLR's claimed damages.

The COLR will incur costs totaling $2,150,000.00 to safely remove the damaged Cell. *See* Ex. 36, Declaration of David Hopkins at ¶ 13. The COLR's expert, Kestner, opined that the costs of removing the damaged Cell and constructing a replacement protection cell are reasonable. *See* Ex. 38, Declaration of Justin Kestner at 29. Significantly, Marquette's own expert also testified that the removal costs the COLR is seeking to recover are reasonable:

> Q. Right. So back to the question. You said -- I was asking you for what you think a reasonable range of cost would be for the extraction of the cell. You said McKinney would be on the low end, and on the high end it could be even more than the $2,150,000 listed here. So what's a reasonable range for the cost of extraction, taking into account risk mitigation to the navigable waterway, to the piers itself and to those other considerations? Also consider you might use the same equipment for the reconstruction of the new cell.
> A. From a public funds perspective, whatever is the cheapest. And when we deal with public funds, it's whatever is the cheapest is the right choice. But what I would expect to see from cost proposals would be somewhere between a half million and two and a half million.
> **Q. Somewhere between 500,000 and 2.5 is the range you would expect to see for this type of work?**
> **A. Correct.** And I'm factoring into the concept that it would make sense from an economic perspective and a logistical perspective to reuse the same equipment for both removal and reinstallation. Massman has a lot of barges, but the number isn't infinity. So, depending on what they have available, it might make sense to use the same barge to do both items. And if that barge is slightly undersized, the removal will be more expensive.

Q. I guess on the other hand then, maybe the installation may have a cost savings because you don't have to bring in another barge because it's already there. I guess that's the positive, correct?
A. Correct. And not only that, I should also say it's the equipment availability. Right?

*See* Ex. 41, Gros Dep. 206:20-208:17, March 3, 2026. This testimony substantiates that Marquette's own expert agrees that the removal cost of the damaged Cell the COLR is seeking is reasonable.

The COLR will incur $5,774,154.00 in costs for the removal and installation of a replacement protection cell. *See* Ex. 36, Declaration of David Hopkins at ¶ 14. Marquette's own expert witness, Gros, additionally testified that the overall costs the COLR is seeking related to the construction of a replacement cell are also reasonable and within a range he has seen for similar projects:

Q. You've seen this before, correct?
A. Yes.
Q. All right. And this is for construction of the cell itself?
A. Yes.
Q. This current contract amount included partially the sheet pile. Then partially the extraction costs and then the original contract amount, and they're adding on top of that this $3 million for construction of the new cell, for a total of $5,744,000. So setting aside the discussion about the extraction, did you take any issue with respect to Massman's estimate for construction of the new cell?
A. I compared it to the -- I think somewhere in my memory banks we did like a $5 million version at Orion for something similar, but it was in Texas. So it felt like it wasn't a terrible number to me.
**Q. Okay. All right. So it was in the ballpark as far as a reasonable --**
**A. Yeah. I felt like --**
**Q. -- cost --**
**A. I feel like it was on the high end, but it was certainly in the ballpark.**

*See* Ex. 41, Gros Dep. 209:17-210:19. This testimony substantiates that Marquette's own expert agrees that the costs the COLR is seeking for installation of a replacement protection cell are reasonable, as he further testified he has no reason to believe the COLR did not try to obtain the best price for this project. *Id.* at 212:15-23.

28

Marquette's own expert's testimony confirms the absence of any genuine dispute regarding the reasonableness of the COLR's damages. During sworn testimony, Marquette's expert expressly opined that the damages sought by the COLR are reasonable. This admission eliminates any factual issue for trial on the reasonableness of the claimed damages and constitutes binding evidentiary support for the COLR's position. Accordingly, because Marquette's retained expert agrees with the COLR's retained expert that the damages sought are reasonable, summary judgment is appropriate.[35]

### iii.    Awarding Prejudgment Interest is Mandatory Under Admiralty Law

Absent exceptional or peculiar circumstances,[36] the COLR is entitled to recover prejudgment interest. Prejudgment interest is commonly calculated from the date of the loss, and Courts frequently apply the average prime rate.[37] A day-weighted calculation of the Wall Street Journal Prime Rate from September 10, 2021, through March 16, 2026, yields an average rate of 6.99%. *See* Ex. 42.[38] Here, because there are no exceptional circumstances that would justify denying such relief, the COLR is entitled to prejudgment interest. As of the date of this filing, at a rate of 6.99%, the COLR is entitled to recover $2,064,738.25 in prejudgment interest.

---

[35] The COLR recognizes that a Daubert motion has been filed to exclude the findings/testimony of Gros. If this motion is granted, the COLR relies upon the evidence of record and testimony of David Hopkins and Justin Kestner. If Gros is not precluded, his testimony simply amplifies the fact that there is no question of fact on this issue.

[36] Often cited examples of such circumstances include the claimant's bad faith, the claimant's assertion of frivolous claims, and the claimant's repeated delay tactics. *See e.g. City of Milwaukee v. Cement Div., Nat'l Gypsum Co*., 515 U.S. 189, 196, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995); *Stroh Container Co. v. Delphi Indus., Inc*., 783 F.2d 743, 752 (8th Cir.1986).

[37] *See Norfolk & Portsmouth Belt Line R. Co. v. M/V MARLIN*, No. CIV.A.2:08CV134, 2009 WL 3363983, at *14 (E.D. Va. Oct. 9, 2009) (citing *In re Oil Spill by Amoco Cadiz,* 954 F.2d 1279, 1335 (7th Cir.1992); *Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.,* 792 F.2d 489, 493 (5th Cir.1986) ("[P]rejudgment interest on repair costs runs from the date of the accident even though the owner does not pay these costs until some later date."); *Complaint of M/V Vulcan,* 553 F.2d 489, 490 (5th Cir.1977) ("[I]n admiralty cases the award of prejudgment interest from the date of loss is the rule rather than the exception."); *City of Chi. v. M/V Morgan,* 248 F.Supp.2d 759, 779 (N.D.Ill.2003).

[38] This rate is the average of the prime rate during the relevant time period. *See Missouri Dry Dock & Repair Co., Inc. v. M/V Ste. Genevieve,* 867 F.Supp. 879 (1994); *see also See Norfolk & Portsmouth Belt Line R. Co. v. M/V MARLIN,* No. CIV.A.2:08CV134, 2009 WL 3363983, at *14 (E.D. Va. Oct. 9, 2009).

## V.    CONCLUSION

The Allision was entirely foreseeable and avoidable, and the cause of the Allision, including any damage caused by the Tow, was well within the knowledge or privity of Marquette. Because the Vessel was controlling the Tow, the Vessel is presumptively liable under governing admiralty law, and it cannot rebut this presumption. Marquette is unable to meet its burden, showing the cause of the Allision was not within its knowledge or privity to obtain limitation of liability. Accordingly, there is no genuine dispute of material fact, and summary judgment in favor of the COLR is warranted. The COLR respectfully requests that the Court award the full amount of damages sought, totaling $6,542,195.00, together with recoverable prejudgment interest at the average prime rate of 6.99% from the date of the Allision, September 10, 2021, to the date judgment is entered, which is universally awarded under admiralty law absent exceptional circumstances, none of which exist here.

Respectfully submitted,

**COHEN & FREY P.C.**

By:    /s/ Jeffrey D. Cohen
       Jeffrey D. Cohen
       Matthew J. Tinnelly (*pro hac vice*)
       The Times Building
       32 Parking Plaza, Suite 402
       Ardmore, PA 19003
       Telephone: (215) 609-1110
       Facsimile: (215) 609-1117
       Jcohen@freightlaw.net
       Mtinnelly@freightlaw.net

       *Attorneys for Plaintiff*
       *City of Little Rock, Arkansas*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 16, 2026, a true and correct copy of the City of Little Rock, Arkansas' Memorandum of Law in Support of its Motion for Summary Judgment was served on the following counsel of record through the Court's CM/ECF System:

Steven W. Quattlebaum, Ark. Bar No. 84127
Thomas H. Wyatt, Ark. Bar No. 2013273
**QUATTLEBAUM, GROOMS & TULL PLLC**
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
quattlebaum@qgtlaw.com
twyatt@qgtlaw.com

John A. Scialdone, Esq.
Katherine Halliday, Esq.
**SCIALDONE LAW FIRM, PLLC**
1319 24th Avenue
Gulfport, MS 39501
Telephone: (228) 822-9340
Facsimile: (228) 822-9343
jscialdone@slfirmus.com
khalliday@slfirmus.com

*Attorneys for Defendants*

Date: March 16, 2026                    By:    /s/ Jeffrey D. Cohen
                                               Jeffrey D. Cohen