**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**CITY OF LITTLE ROCK, ARKANSAS**                                            **PLAINTIFF**

**v.**                                     **Case No. 4:23-CV-00831-BSM**

**MARQUETTE TRANSPORTATION**
**COMPANY GULF-INLAND, LLC, et al.**                                         **DEFENDANTS**

**PLAINTIFF CITY OF LITTLE ROCK, ARKANSAS'**
**RULE 56.1 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

In accordance with Fed. R. Civ. P. 56 and Local Rules 7.2 and 56.1, Plaintiff, City of Little Rock, Arkansas ("COLR"), by and through its undersigned counsel, hereby submits the following statement of material facts not in dispute:

**I.    The Clinton Pedestrian Bridge at MM 118.5**

1.    The City of Little Rock, Arkansas ("COLR") owns the Clinton Pedestrian Bridge at NM 118.2 on the Arkansas River in Little Rock, Arkansas (the "Bridge"), which is a lawful permitted structure. *See* Ex. 1, Hopkins Dep. 21:11-19, February 11, 2026; *see also* Ex. 2.

RESPONSE:

2.    There is no evidence that the Bridge or its protection cells were ever deemed an obstruction or hazard to navigation or impairing the navigable channel before the allision on September 10, 2021 (the "Allision"). *See* Ex. 3, McIntyre Dep. 177:24-178:10, February 5, 2026.

RESPONSE:

3.    The Bridge did not sustain any damage because of the Allision. *Id.* at 305:24-25, 306:6-8.

RESPONSE:

4.    The Bridge is visually inspected daily. *See* Ex. 1, Hopkins Dep. 17:22-18:19.

RESPONSE:

5.  In 1999, the Bridge was inspected by two professional engineers from Garver Engineers, Terry Johnson and Walt Catlett, who determined that the Bridge was in very good condition and that a more detailed structural investigation or testing was not required. *See* Ex. 1, Hopkins Dep. 27:24-28:3, 28:12-29:17; *see also* Ex. 4 at 2.

RESPONSE:

## II.     Marquette Transportation Company Gulf-Inland, LLC

6.  Marquette Transportation Company Gulf-Inland, LLC ("Marquette") provides horsepower on the inland and western rivers waterways in the United States. *See* Ex. 3, McIntyre Dep. 23:8-11.

RESPONSE:

7.  Marquette has 65 vessels in its fleet. *Id.* at  23:12-13.

RESPONSE:

8.  Marquette Transportation Company Offshore, LLC, has nine vessels in its fleet. *Id.* at 23:18-20.

RESPONSE:

9.  Marquette does not own any barges. *Id.* at 23:23-24.

RESPONSE:

10. Marquette employs 180 captains (including pilots and wheelmen) and 350-ish deckhands, and 60 shoreside employees. *Id.* at 24:11-19, 21-23.

RESPONSE:

11. The Arkansas River is one of the main rivers that Marquette operates on. *Id.* at 22:12-16.

RESPONSE:

12. Marquette transports any commodity that can be moved on a barge. *Id.* at 26:19-22.

RESPONSE:

13. Marquette's Port Captains are in charge of staffing the wheelhouse with a crew licensed to navigate the vessel. *Id.* at 30:23-31:6.

RESPONSE:

14. Marquette's Port Captains determine whether a navigational assessor is going to be on a vessel. *Id.* at 31:18-22.

RESPONSE:

15. In 2021, Marquette employed two navigational assessors, Brian Lowrance and Anthony Verdin. *Id.* at 32:18-25.

RESPONSE:

16. Port Captains are within a tier of management of Marquette. *Id.* at 37:6-8.

RESPONSE:

17. When a navigational assessor assesses a new-hire, they are doing so at the request of a Port Captain, Marquette's management. *Id.* at 37:21-38:12.

RESPONSE:

18. Port Captains are part of Marquette's operations department. *Id.* at 158:18-21.

RESPONSE:

19. Marquette's operations department is management. *Id.* at 181:5-7.

RESPONSE:

20. Marquette has no handbook for navigational assessors. *Id.* at 181:18-19.

RESPONSE:

### III.    The I-30 Bridge

21. The I-30 bridge has two navigation channels. *See* Ex. 3, McIntyre Dep. 152:24-153:6.

RESPONSE:

22. On October 22, 2020, the United States Army Corps of Engineers ("USACE") issued a notice to mariners advising of construction near the I-30 bridge. *See* Ex. 5.

RESPONSE:

23. On January 6, 2021, the United States Coast Guard issued a notice to mariners advising "Due to new pier work in the right descending channel, all navigation transiting the I-30 Bridge must now use the left descending channel span." *See* Ex. 6 at 13.

RESPONSE:

24. On January 8, 2021, the USACE issued a notice to mariners advising "All upbound and downbound vessels must use the left descending channel span." *See* Ex. 7.

RESPONSE:

25. On January 13, 2021, the USCG issued a notice to mariners advising "Due to new pier work in the right descending channel, all navigation transiting the I-30 Bridge must now use the left descending channel span." *See* Ex. 8 at 13-14.

RESPONSE:

26. Marquette and its mariners knew of the I-30 bridge and its bridge piers.  *See* Ex. 3, McIntyre Dep. 49:9-18.

RESPONSE:

27. Marquette did not issue any safety alerts for the I-30 bridge. *Id.* at 152:14-23, 177:9-18.

RESPONSE:

28. Despite knowing about the construction project near the I-30 bridge, the Kiffer E. Bailey's (the "Vessel") crew did not have a safety meeting on this issue. *See* Ex. 9, Treadwell Dep. 78:10-79:21, July 11, 2025.

RESPONSE:

### IV.    Mariner Training and Policies and Procedures

29. Marquette's policies and procedures require the preparation of an incident report for events that require reporting to the USCG. *See* Ex. 3, McIntyre Dep. at 53:10-25; *see also* Ex. 10.

RESPONSE:

30. Marquette's Mission Zero is Marquette's commitment to achieving zero accidents, zero injuries, and zero spills. *See* Ex. 3, McIntyre Dep. 133:4-8; *see also* Ex. 37.

RESPONSE:

31. Marquette does not have any policies or procedures in place regarding the role and requirements of a navigational assessor. *See* Ex. 3, McIntyre Dep. 137:9-13; 139:5-9.

RESPONSE:

32. Marquette's Corporate Stop Work Policy states that all incidents are preventable. *Id.* at 140:9-12; *see also* Ex. 11.

RESPONSE:

33. Industry standard requires more than just relying upon regulatory minimums of mariner licensure. *See* Ex. 3, McIntyre Dep. 114:13-16, 115:16-23, 116:15-20, 166:12-22.

RESPONSE:

34. Marquette does not have a written policy requiring that navigational assessments be performed for new hires. *Id.* at 161:20-162:1.

RESPONSE:

35. Marquette does not test new hires on its Safety Management System ("SMS"). *Id.* at 180:11-13.

RESPONSE:

36. Marquette has the resources to locate local notices to mariners issued by the USCG or the USACE. *Id.* at 229:13-235:16, 238:17-239:2.

RESPONSE:

37. The term on watch means on duty. *Id.* at 251:11-14, 254:4-13.

RESPONSE:

38. The maximum time a crewmember can be on watch is twelve hours in a twenty-four-hour period. *Id.* at 252:24-253:10; *see also* Ex. 12.

RESPONSE:

39. Marquette does not have a policy on including assessors in boat logs. *See* Ex. 3, McIntyre Dep. 259:11-20.

RESPONSE:

**V.    The M/V Kieffer E. Bailey**

40. The Vessel's Official No. is 1253271. *See* Ex. 13.

RESPONSE:

41. The estimated fair market value of the Vessel on September 10, 2021, was $5,750,000.00. *See* Ex. 14 at 7.

RESPONSE:

42. The Vessel was built in 2014. *See* Ex. 13.

RESPONSE:

43. The Vessel is 78' long, its beam is 34', its air draft is 47', and its depth is 11'. *See* Ex. 13.

RESPONSE:

44. The Vessel has a Z-Drive propulsion system. *See* Ex. 3, McIntyre Dep. 59:15-17. *See* Ex. 13.

RESPONSE:

45. The Vessel typically pushes 1 to 12 barges. *See* Ex. 3, McIntyre Dep. 61:9-12.

RESPONSE:

46. In 2021, shoreside personnel communicated with the Vessel via email and phone. *Id.* at 62:2-10.

RESPONSE:

### VI.   Captain Anthony Treadwell

47. Anthony Treadwell ("Treadwell") never operated a vessel on the Arkansas River before the Allision. *See* Ex. 9, Treadwell Dep. 15:20-16:3, 20:6-8; *see also* Ex. 3, McIntyre Dep. 119:8-16.

RESPONSE:

48. Treadwell remained in the wheelhouse before the Allision because he had never operated a vessel on the Arkansas River and wanted to see the bridges. *See* Ex. 9, Treadwell Dep. 29:20-30:22; *see also* Ex. 3, McIntyre Dep. 120:3-8.

RESPONSE:

49. Treadwell would not have allowed Patreon Hopkins ("Hopkins") to navigate through the area of the Arkansas River where the Allision occurred had he known Hopkins' true level of experience. *See* Ex. 9, Treadwell Dep. 29:20-31:12.

RESPONSE:

50. Treadwell was upset that Marquette did not tell him that Hopkins never pushed more than six barges before the Allision. *See* Ex. 3, McIntyre Dep. 182:18-23; *see also* Ex. 9, Treadwell Dep. 32:4-24.

RESPONSE:

51. Marquette made representations to Treadwell that Hopkins knew what he was doing. *Id.* at 59:23-60:6.

RESPONSE:

## VII.    Pilot Patreon Hopkins

52. Hopkins never operated a vessel on the Arkansas River before the Allision. *See* Ex. 15, Hopkins Dep. 12:11-16, June 15, 2025.

RESPONSE:

53. There is no documented evidence that Marquette asked Hopkins about his previous experience piloting a vessel. *See* Ex. 3, McIntyre Dep. 91:21-92:13.

RESPONSE:

54. Marquette has no documented evidence on whether Hopkins was interviewed in person or telephonically. *See* Ex. 3, McIntyre Dep. 99:21-23.

RESPONSE:

55. Marquette did not complete documentation related to Hopkins' operational route and experience review. *See* Ex. 3, McIntyre Dep. 101:21-25, 103:1-3, 105:18-24; *see also* Ex. 16.

RESPONSE:

56. Marquette has no documentation related to whether Hopkins was asked about his knowledge of vessel operations during the hiring process. *See* Ex. 3, McIntyre Dep. 106:13-17, 107:2-6.

RESPONSE:

57. Marquette's employee file for Hopkins does not contain documentation substantiating that Hopkins had a proper credential to act as a pilot on the wheelhouse and operate the Vessel. *See* Ex. 3, McIntyre Dep. 110:12-25, 111:19-23; *see also* Ex. 17.

RESPONSE:

58. There is no evidence to substantiate that Marquette performed a reference check for Hopkins to verify his certificates/licenses and previous work experience pursuant to Marquette's own policies and procedures. *See* Ex. 3, McIntyre Dep. 314:2-316:20; *see also* Ex. 9, Treadwell Dep. 32:4-24; Ex. 18.

RESPONSE:

59. At the time of the Allision, Hopkins had been a Maquette employee for three days. *See* Ex. 3, McIntyre Dep. 160:20-25.

RESPONSE:

60. Marquette did not know whether Hopkins was a cut loose wheelman when he left his prior employer. *Id.* at 171:2-9, 175:23-25.

RESPONSE:

61. Cut loose means a mariner has met the requirements of the industry standard to operate a vessel. *Id.* at 176:1-12.

RESPONSE:

62. A mariner can have a mate pilot license, but still not be cut loose. *See* Ex. 9, Treadwell Dep. 34:16-35:5, 71:5-11.

RESPONSE:

63. Hopkins never stood a navigational watch on his own at his previous place of employment. *See* Ex. 3, McIntyre Dep. 288:19-24; *see also* Ex. 19 at 9.

RESPONSE:

64. Marquette never determined that Hopkins lied during the interview process. *See* Ex. 3, McIntyre Dep. 291:15-20.

RESPONSE:

65. At the time of the Allision, Hopkins held a mate pilot's license for 231 days or 7 months, 19 days. *See* Ex. 3, McIntyre Dep. 328:15-329:16; *see also* Ex. 20.

RESPONSE:

## VIII.    Navigational Assessor Brian Lowrance

66. The sole reason Brian Lowrance ("Lowrance") was on the M/V Kieffer E. Bailey to perform a navigational assessment of Hopkins. *See* Ex. 15, Hopkins Dep. 28:4-10; *see also* Ex. 9, Treadwell Dep. 23:17-20.

RESPONSE:

67. The industry standard is that a navigational assessor is supposed to be on duty when the person he is assessing is also on duty. *See* Ex. 3, McIntyre Dep. 124:1-12.

RESPONSE:

68. At the time of the Allision, Lowrance was sleeping instead of performing a navigational assessment of Hopkins. *See* Ex. 21; *see also* Ex. 3, McIntyre Dep. 125:6-17; Ex. 9, Treadwell Dep. 37:3-5.

RESPONSE:

69. It is a failure of the industry standard for the navigational assessor to be sleeping as opposed to awake while the person they are supposed to be assessing is operating the vessel. Ex. 3, McIntyre Dep. 128:24-129:9.

RESPONSE:

70. The Vessel's daily vessel logs do not show what Lowrance was doing when he was on the vessel.  *See* Ex. 3, McIntyre Dep. 260:20-261:9; *see also* Ex. 22, Ex. 23, Ex. 24, Ex. 25.

RESPONSE:

## IX.    The Allision

71. The Allision occurred on September 10, 2021, at night. *See* Ex. 19; *see also* Ex. 26.

RESPONSE:

72. The Voyage Plan did not include a risk assessment regarding the I-30 bridge construction project or for navigating any of the bridges on the Arkansas River. *See* Ex. 27.

RESPONSE:

73. Hopkins was operating the Vessel when it allided with the I-30 bridge protection cell. *See* Ex. 15, Hopkins Dep. 17:7-10.

RESPONSE:

74. At the time of the Allision, the Vessel was pushing 11 barges, 10 of which were fully loaded with wheat and one was empty (the "Tow"). *See* Ex. 3, McIntyre Dep. 72:14-20; *see also* Ex. 26, Ex. 28.

RESPONSE:

75. At the time of the Allision, the Tow's length was 800' excluding the Vessel. *See* Ex. 3, McIntyre Dep. 69:24-70:4; *see also* Ex. 26, Ex. 28.

11

RESPONSE:

76. The Tow's width was 105'. Ex. 3, McIntyre Dep. 154:5-6; *see also* Ex. 26; Ex. 28.

RESPONSE:

77. The Tow allided with the I-30 bridge's protection cell and then broke free. *See* Ex. 29; *see also* Ex. 30; Ex. 26.

RESPONSE:

78. The Tow then ran away from the Vessel and allided with the Bridge's protection cell. *See* Ex. 29; *see also* Ex. 30; Ex. 26.

RESPONSE:

79. The Vessel and Tow were not lined up properly going into the I-30 bridge. *See* Ex. 3, McIntyre Dep. 272:16-22.

RESPONSE:

80. The Tow's lead barge was damaged as a result of the Allision. *See* Ex. 31.

RESPONSE:

81. The pending freight for the Vessel's voyage was $150,918.48. *See* Ex. 32.

RESPONSE:

82. At the time of the Allision, the current was in a slack state, which means a routine state. *See* Ex. 3, McIntyre Dep. 188:8-16; *see also* Ex. 15, Hopkins Dep. 12:21-24; Ex. 26.

RESPONSE:

83. The vessel was moving at 5.1 mph when the tow allided with the I-30 protection cell. *See* Ex. 33; *see also* Ex. 3, McIntyre Dep. 269:5-8.

RESPONSE:

84. The river stage was at 7.06, a normal stage for the Arkansas River. *See* Ex. 26; *see also* Ex. 3, McIntyre Dep. 269:23-25.

RESPONSE:

85. There were no issues with visibility at the time of the Allision. *See* Ex. 9, Treadwell Dep. 36:13-16.

RESPONSE:

86. Voyage risk assessments are supposed to be prepared before voyages, and there is no documentation substantiating that a voyage risk assessment was prepared before the Allision. *Id.* at 339:4-10, 339:22-340:1-3; *see also* Ex. 34; Ex. 27.

RESPONSE:

**X.     After the Allision**

87. After the Allision, Marquette prepared an incident report pursuant to its Shoreside Operations Manual 5.2.  *See* Ex. 10; *see also* Ex. 19; Ex. 3, McIntyre Dep. 144:11-15.

RESPONSE:

88. Eight days after the Allision, Marquette employee Leo Wardlaw ("Wardlaw") performed a navigational assessment of Hopkins. *See* Ex. 35; *see also* Ex. 3, McIntyre Dep. 207:9-11.

RESPONSE:

89. Parts of Wardlaw's assessment of Hopkins were dismal. *Id.* at 130:11-15.

RESPONSE:

90. Wardlaw determined that Hopkins was not very well-versed in running a vessel. *Id.* at 208:20-209:5; *see also* Ex. 35.

RESPONSE:

91. Wardlaw determined that Hopkins was "not experienced with more than six barges," something Marquette could and should have known before the allision. *See* Ex. 35; *see also* Ex. 3, McIntyre Dep. 209:6-11, 209:25-210:11.

RESPONSE:

92. It's common practice to contact a mariner's prior employee to vet them, and there is no reason why Marquette could not have done so for Hopkins. *See* Ex. 3, McIntyre Dep. 210:12-211:2.

RESPONSE:

93. Wardlaw determined that Hopkins, "Doesn't communicate when necessary in a timely manner." *See* Ex. 3, McIntyre Dep. 188:8-16; *see also* Ex. 35.

RESPONSE:

94. Wardlaw determined that Hopkins, "Doesn't understand when he's getting into a situation." *See* Ex. 3, McIntyre Dep. 212:21-213:12; *see also* Ex. 35.

RESPONSE:

95. Wardlaw determined that Hopkins "does not at all use or understand radar." *See* Ex. 3, McIntyre Dep. 221:1-13; *see also* Ex. 35.

RESPONSE:

96. Wardlaw determined that Hopkins "does not understand how current works." *See* Ex. 3, McIntyre Dep. 221:14-222:17, 225:15-23; *see also* Ex. 35.

RESPONSE:

97. Wardlaw determined that Hopkins, "Struggles to make locks, can't judge distance." *See* Ex. 3, McIntyre Dep. 226:6-11; *see also* Ex. 35.

RESPONSE:

98. Wardlaw determined, "It is my good judgment that Patreon needs a lot of work. Says he was a pilot mate but clearly has not stood many watches alone." *See* Ex. 3, McIntyre Dep. 227:15-228:12; *see also* Ex. 35.

RESPONSE:

99. Marquette terminated Hopkins after his post-incident navigational assessment. *See* Ex. 3, McIntyre Dep. 89:14-18; *see also* Ex. 15, Hopkins Dep. 10:20-25.

RESPONSE:

100.    Marquette terminated Treadwell after the Allision. *See* Ex. 9, Treadwell Dep. 11:10-16, 53:11-15; *see also* Ex. 3, McIntyre Dep. 185:2-9.

RESPONSE:

## XI.    The COLR's Damages

101.    After the Allision, the COLR retained Volkert to assess the damaged protection cell. The cost for this work totaled $5,625.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 8.

RESPONSE:

102.    On March 11, 2025, the COLR retained HNTB Corporation to provide preliminary design and engineering services for a replacement protection cell for $49,975.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 9.

RESPONSE:

103.    On August 19, 2025, the COLR entered into a supplemental contract with HNTB Corporation for full design and engineering services for a replacement protection cell, increasing the original contract by $712,441.00, for a revised total of $762,416.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 10.

RESPONSE:

104.     On February 21, 2025, the COLR retained Massman Construction Company to perform preconstruction services for a replacement protection cell for $49,500.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 11.

RESPONSE:

105.     On November 25, 2025, the COLR and Massman Construction Company executed Change Order #1 to place an order for sheet pilings to meet the manufacturer's rolling schedule and delivery to the COLR by early March 2026, increasing the contract amount by $527,700.00, for a revised total of $577,200.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 12.

RESPONSE:

106.     On December 4, 2025, the COLR and Massman Construction Company executed Change Order #2 to provide for the demolition, removal, and disposal of the damaged protection cell at the Bridge, increasing the contract amount by $2,150,000.00, for a revised total of $2,727,200.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 13.

RESPONSE:

107.     On January 21, 2026, the COLR and Massman Construction Company executed Change Order #3 to provide for the construction of the replacement cell at the Bridge, increasing the contract amount by $3,046,577.00, for a revised total of $5,774,154.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 14.

RESPONSE:

108.     As of the date of this filing, the total damage the COLR will incur for replacing the Bridge's protection cell damaged because of the Allision is $6,542,195.00. *See* Ex. 36, Declaration of David Hopkins at ¶ 15.

RESPONSE:

**COHEN & FREY P.C.**

By:     /s/ Jeffrey D. Cohen
        Jeffrey D. Cohen
        Matthew J. Tinnelly (*pro hac vice*)
        The Times Building
        32 Parking Plaza, Suite 402
        Ardmore, PA 19003
        Phone: (215) 609-1110
        Fax: (215) 609-1117
        Email: Jcohen@freightlaw.net
        Email: Mtinnelly@freightlaw.net

Date: March 16, 2026          *Attorneys for Plaintiff,*
                              *City of Little Rock, Arkansas*

17

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 16, 2026, a true and correct copy of the City of Little Rock, Arkansas' Rule 56.1 Statement of Material Facts Not in Dispute was served on the following counsel of record through the Court's CM/ECF System:

Steven W. Quattlebaum, Ark. Bar No. 84127
Thomas H. Wyatt, Ark. Bar No. 2013273
**QUATTLEBAUM, GROOMS & TULL PLLC**
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
quattlebaum@qgtlaw.com
twyatt@qgtlaw.com

John A. Scialdone, Esq.
Katherine Halliday, Esq.
**SCIALDONE LAW FIRM, PLLC**
1319 24th Avenue
Gulfport, MS 39501
Telephone: (228) 822-9340
Facsimile: (228) 822-9343
jscialdone@slfirmus.com
khalliday@slfirmus.com

*Attorneys for Defendants*

Date: March 16, 2026                    By:    /s/ Jeffrey D. Cohen
                                               Jeffrey D. Cohen