**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**CITY OF LITTLE ROCK, ARKANSAS**                                      **PLAINTIFF**

**v.**                                      **Case No. 4:23-CV-00831-BSM**

**MARQUETTE TRANSPORTATION**
**COMPANY GULF-INLAND, LLC, et al.**                                      **DEFENDANTS**

**PLAINTIFF CITY OF LITTLE ROCK, ARKANSAS'**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's scheduling order (ECF No. 48), Plaintiff, City of Little Rock, Arkansas ("COLR"), by and through its undersigned attorneys, submits the following Proposed Findings of Fact and Conclusions of Law.

## I.   FINDINGS OF FACT

1.   On the night of September 10, 2021, Defendants, Marquette Transportation Company Gulf-Inland, LLC, et al. ("Marquette"), owned and operated the M/V Kieffer E. Bailey (the "Vessel") while pushing a tow of eleven barges, ten of which were fully loaded with wheat (the "Tow") (ECF Nos. 58-26; 58-19).

2.   The Tow was approximately 800 feet in length (excluding the Vessel) and approximately 105 feet wide (ECF Nos. 58-3 at 69:24–70:4; 58-26).

3.   The Tow weighed approximately 19,000 tons (ECF No. 58-38 at 41 of 54).

4.   The Vessel and Tow transited a section of the Arkansas River near Little Rock, Arkansas, requiring passage through six closely spaced bridges, including the Interstate 30 bridge and the Clinton Pedestrian Bridge (ECF Nos. 58-26; 58-19).

5.   The Clinton Pedestrian Bridge is owned by Plaintiff, City of Little Rock ("COLR"), and is protected by a permitted protection cell designed to absorb vessel impacts (ECF Nos. 58-2).

1

6. Before the Allision, the Clinton Pedestrian Bridge protection cell was upright, intact, and performing its intended protective function (ECF Nos. 75-1 at 77:21-24; 58-38 at 27 of 54).

7. The protection cell was not an obstruction or hazard to navigation (ECF Nos. 58-2; 58-3 at 177:24–178:10).

8. As the Vessel approached the Interstate 30 bridge, the Tow was not properly aligned for transit (ECF No. 58-3 at 272:16–22).

9. The Vessel and Tow allided with the upriver protection cell of the Interstate 30 bridge (ECF Nos. 58-19; 58-26).

10. Following that impact, the Tow broke free from the Vessel and ran downriver uncontrolled (ECF Nos. 58-19; 58-26).

11. The uncontrolled Tow then allided with the upriver protection cell of the Clinton Pedestrian Bridge (ECF Nos. 58-19; 58-26).

12. At the time of the Allision, Pilot Patreon Hopkins ("Hopkins") was operating the Vessel (ECF Nos. 58-19; 58-26).

13. Hopkins had no prior experience navigating the Arkansas River (ECF Nos. 58-3 at 119:8-16; 58-15 at 12:11-16).

14. Hopkins was a Marquette employee for only a matter of days at the time of the Allision (ECF No. 58-3 at 160:20–25).

15. Hopkins had never stood a navigational watch alone before the night of the Allision (ECF Nos. 58-3 at 288:19–24; 58-19; 58-35).

16. Hopkins had never handled a tow of the size or configuration involved in the Allision (ECF Nos. 58-3 at 209:6–11; 58-35).

17.    Captain Anthony Treadwell ("Treadwell") had no prior experience navigating the Arkansas River (ECF Nos. 58-3 at 119:8–16; 58-9 at 15:20–16:3).

18.    At the time of the Allision, Treadwell was off duty and not present in the wheelhouse supervising navigation (ECF No. 58-9 at 29:20-30:10).

19.    Marquette assigned a navigational assessor, Brian Lowrance, to evaluate Hopkins during the transit (ECF No. 58-19).

20.    At the time of the Allision, Lowrance was asleep and not performing any supervisory or assessment function (ECF No. 58-21).

21.    Marquette had no policies or procedures governing the role or responsibilities of navigational assessors (ECF No. 58-3 at 137:9–13, 161:20–162:1).

22.    Marquette did not require documented navigational assessments for new hires (ECF No. 58-3 at 161:20–162:1).

23.    Marquette did not include navigational assessors in vessel logs (ECF No. 58-3 at 259:11–20).

24.    Marquette did not test new hires on its Safety Management System before assigning operational duties (ECF No. 58-3 at 180:11–13).

25.    Marquette's Port Captains were responsible for staffing the Vessel and determining whether a navigational assessor was required (ECF No. 58-3 at 30:23–31:6).

26.    Port Captains are part of Marquette's management (ECF No. 58-3 at 37:6–8).

27.    Marquette failed to verify Hopkins's qualifications before assigning him to operate the Vessel (ECF Nos. 58-3 at 91:21–92:13, 209:25–211:2, 314:2–316:20; 58-16).

28.    Marquette did not perform reference checks or otherwise verify Hopkins's prior experience (ECF Nos. 58-3 at 91:21–92:13, 209:25–211:2, 314:2–316:20; 58-16).

29. Marquette did not complete documentation confirming Hopkins's operational competency or qualifications (ECF Nos. 58-3 at 101:21–25; 58-16).

30. Following the Allision, Marquette's internal evaluation process identified deficiencies in Hopkins's experience, situational awareness, judgment, and vessel handling, including those reflected in the Leo Wardlaw ("Wardlaw") navigational assessment (ECF Nos. 58-19; 58-35).

31. The Wardlaw navigational assessment identified significant deficiencies in Hopkins's situational awareness, judgment, and vessel handling under the conditions present during the Allision (ECF No. 58-35).

32. The deficiencies identified in Marquette's internal assessments correspond to the operational failures observed during the Allision (ECF Nos. 58-3 at 272:16–22; 58-19; 58-35).

33. The deficiencies identified in Marquette's internal assessments were not latent or unknowable, but were of the type that would have been revealed through reasonable hiring, vetting, training, and supervision before assigning Hopkins to operate the Vessel, and therefore fall within Marquette's knowledge or privity (ECF Nos. 58-19; 58-35).

34. Marquette had notice of navigation conditions at the Interstate 30 bridge through notices to mariners (ECF Nos. 58-5; 58-6; 58-7; 58-8).

35. Marquette did not conduct a safety meeting addressing known bridge conditions before the transit (ECF No. 58-9 at 78:10–79:19).

36. Marquette did not prepare or document a voyage risk assessment before the transit (ECF No. 58-3 at 339:4–10).

37. Marquette did not issue safety alerts addressing known navigation conditions before the transit (ECF No. 58-3 at 152:14–23).

38.     At the time of the Allision, river conditions were normal, and the current was slack (ECF Nos. 58-3 at 188:8–16; 58-26).

39.     The Allision did not result from unavoidable or extraordinary river conditions (ECF Nos. 58-3 at 188:8–16; 58-26).

40.     The loss of control of the Vessel and Tow caused the initial allision, the breakaway, and the downstream allision (ECF Nos. 58-19; 58-26).

41.     Marquette's failures in hiring, vetting, training, supervision, and voyage preparation resulted in an inexperienced and inadequately supervised crew operating the Vessel during the transit (ECF Nos. 58-19; 58-35).

42.     Those failures were attributable to Marquette's management, including its Port Captains responsible for staffing and operational decisions (ECF No. 58-3 at 30:23–31:6, 37:6–8).

43.     The acts and conditions that caused the Allision, including the assignment of an inexperienced pilot, lack of supervision, and failure to prepare for the voyage, were within Marquette's knowledge or privity because they arose from management-level decisions regarding staffing, supervision, and voyage preparation (ECF Nos. 58-3 at 30:23–31:6; 58-19; 58-35).

44.     The Allision was a substantial factor in destroying the Clinton Pedestrian Bridge protection cell (ECF Nos. 58-38; 68-11).

45.     Before the Allision, the protection cell was fully functional (ECF Nos. 75-1 at 77:21-24; 58-38 at 27 of 54).

46.     The Allision rendered the protection cell a total loss requiring removal and replacement (ECF Nos. 75-1 at 151:2-12; 68-11).

47.     The United States Coast Guard required the removal and replacement of the protection cell following the Allision (ECF No. 58-2).

48.    Removal of the protection cell was necessary before replacement could occur (ECF Nos. 58-36 ¶ 13; 68-11).

49.    The Clinton Pedestrian Bridge protection cell could not be repaired in place and required complete removal and replacement following the Allision (ECF Nos. 75-1 at 151:2–12; 58-36 ¶ 7; 68-11).

50.    The replacement work required engineering, demolition, removal, construction, and related project work necessary to restore the protection cell's intended protective function (ECF Nos. 58-36; 75-1 at 81:21–82:24).

51.    Following the Allision, the COLR retained HNTB to evaluate the damaged protection cell, assess replacement alternatives, and develop engineering and design solutions necessary to restore the protection cell's protective function (ECF No. 75-1 at 81:21–82:24).

52.    The COLR also retained Massman Construction to evaluate constructability, demolition, and replacement alternatives and to remove and replace the damaged protection cell (ECF Nos. 58-36; 75-1 at 81:21–82:24; 75-6).

53.    The COLR evaluated replacement alternatives and undertook efforts to mitigate costs while restoring the protection cell's intended protective function following the Allision (ECF Nos. 75-1 at 81:21–82:24, 145:5–146:23; 75-6).

54.    The protection cell existed to protect the Clinton Pedestrian Bridge from vessel impacts and served an integral protective function for the Bridge (ECF Nos. 58-38; 75-4).

55.    Before the Allision, the protection cell was upright, intact, and performing its intended protective function. There were no reports of structural failure, misalignment, or navigation obstruction associated with the protection cell (ECF Nos. 58-3 at 177:24–178:10; 75-1 at 77:21–24; 75-4).

56.     The replacement and restoration work was undertaken in response to the destruction caused by the Allision and the resulting need to restore protection for the Bridge and navigation safety (ECF Nos. 75-1 at 81:21–82:24; 68-11).

57.     The costs incurred and sought by the COLR were necessary to remove and replace the destroyed protection cell and restore its protective function (ECF Nos. 58-36; 58-38; 58-41 at 206:20–208:17, 209:17–210:19).

58.     Marquette's own expert acknowledged that the COLR's claimed removal and replacement costs fall within a reasonable range (ECF No. 58-41 at 206:20–208:17, 209:17–210:19).

## II.    PROPOSED CONCLUSIONS OF LAW

1.      This Court has admiralty jurisdiction over this action pursuant to 28 U.S.C. § 1333.

2.      The Allision is governed by maritime law.

3.      Marquette owed a duty to exercise reasonable care in the operation and management of the Vessel and Tow. *See Nieves v. Cooper Marine & Timberlands Corp.*, No. 3:15CV00350 JLH, 2018 WL 1855953, at *9 (E.D. Ark. Apr. 18, 2018) (quoting Schoenbaum, at § 5-2.).

4.      Marquette breached that duty.

5.      When a moving vessel allides with a stationary object, a presumption of fault applies. *See The Oregon,* 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895).

6.      The burden shifts to Marquette to demonstrate that it was without fault, that any fault did not cause the Allision, that the stationary structure was at fault, or that the Allision was the result of an inevitable accident. *See The Oregon,* 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895); *see also Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 795 (5th Cir. 1977).

7

7.    The evidence establishes that Marquette has not rebutted the presumption.

8.    The evidence establishes that Marquette is liable for the Allision and resulting damages.

9.    Independent of the presumption, Marquette's negligence was a substantial factor in causing the Allision and resulting damage. *See Am. S.S. Co. v. Hallett Dock Co.,* 862 F. Supp. 2d 919, 943 (D. Minn. 2012).

10.    The Allision resulted from Marquette's failures in staffing, training, supervision, and voyage preparation. *See In re Complaint of Messina,* 574 F.3d 119, 127 (2d Cir. 2009) (citing *Tug Ocean Prince,* 584 F.2d at 1155; *Guglielmo,* 897 F.2d at 61).

11.    No intervening or superseding cause breaks the causal chain.

12.    The Allision was not an unavoidable accident.

13.    The evidence establishes that Marquette has failed to show a lack of knowledge or privity.

14.    The acts and conditions causing the Allision were within Marquette's knowledge or privity. *See Vulcan Materials Co. v. Massiah,* 645 F.3d 249, 255 (4th Cir. 2011).

15.    Limitation of liability is therefore unavailable.

16.    The Allision damaged the protection cell beyond repair.

17.    The COLR is entitled to recover the reasonable costs necessary to remove, replace, and restore the protection cell.

18.    The Clinton Pedestrian Bridge protection cell served an integral protective and safety function for the Bridge, and it did not possess an independent market value or function apart from protecting the Bridge from vessel impacts.

19.     Where a structure serves an integral protective function, damages are measured by the reasonable costs necessary to restore the damaged property following destruction caused by a maritime allision. *See BP Expl. & Oil, Inc. v. Moran Mid-Atl. Corp.,* 147 F. Supp. 2d 333, 337 (D.N.J. 2001); *see also Tampa Port Auth. v. M/V Duchess,* 65 F. Supp. 2d 1279, 1298 (M.D. Fla.), amended, 65 F. Supp. 2d 1299 (M.D. Fla. 1997), aff'd, 184 F.3d 822 (11th Cir. 1999).

20.     Under these circumstances, depreciation does not apply as maritime law requires full restoration of a critical integral protective component. The proper measure of damages is the reasonable cost necessary to remove, replace, engineer, and restore the protection cell.

21.     Replacement of the protection cell was necessary.

22.     The replacement conforms to modern engineering standards and does not constitute an impermissible betterment or windfall to the COLR.

23.     Where the damaged structure is an integral part of the Bridge, depreciation does not apply to restoration and replacement costs following a maritime allision. *See BP Expl. & Oil, Inc. v. Moran Mid-Atl. Corp.,* 147 F. Supp. 2d 333, 337 (D.N.J. 2001); *see also Matter of Crounse Corp.,* 956 F. Supp. 1377, 1382 (W.D. Tenn. 1996) (citing *Freeport Sulphur Co. v. S/S Hermosa,* 526 F.2d 300, 305 (5th Cir.1976)); *see also Tug Go–Getter,* 468 F.2d at 1274.

24.     Depreciation does not apply to the costs incurred to remove, replace, engineer, and restore the protection cell because replacement was necessary.

25.     The existence of preexisting conditions or maintenance issues does not reduce recoverable damages because the Allision was a substantial factor in causing the destruction requiring removal and replacement.

9

26.     Maritime law does not permit a tortfeasor to avoid liability merely because preexisting conditions may have existed where the tortfeasor's conduct was a substantial factor in producing the loss.

27.     The COLR acted reasonably in evaluating and undertaking demolition, removal, engineering, and replacement efforts necessary to restore the protection cell's protective function following the Allision.

28.     Recoverable damages include demolition, removal, and replacement. *See In the Matter of Complaint of Grand Famous Shipping Ltd.,* No. 4:18-CV-2046, 2024 WL 3620313, at *40 (S.D. Tex. Aug. 1, 2024).

29.     Removal costs are recoverable and not subject to depreciation. *See Kansas City S. Ry. Co. v. Barge HBC 8106,* 642 F. Supp. 609, 613 (W.D. La. 1986).

30.     Marquette cannot reduce damages based on alleged preexisting conditions. *See Freeport Sulphur Co. v. S/S Hermosa,* 526 F.2d 300 (5th Cir. 1976); *see also City of Chicago v. M/V Morgan,* 375 F.3d 563 (7th Cir. 2004).

31.     The COLR is entitled to recover damages reasonably necessary to remove, replace, and restore the protection cell and its protective function.

32.     Prejudgment interest is warranted. *See e.g. City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 196, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995); *see also Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 752 (8th Cir.1986).

33.     Judgment should be entered in favor of the COLR.

10

Respectfully submitted,

**COHEN & FREY P.C.**


By:    /s/ Jeffrey D. Cohen
         Jeffrey D. Cohen
         Matthew J. Tinnelly (*pro hac vice*)
         The Times Building
         32 Parking Plaza, Suite 402
         Ardmore, PA 19003
         Telephone: (215) 609-1110
         Facsimile: (215) 609-1117
         Jcohen@freightlaw.net
         Mtinnelly@freightlaw.net

         *Attorneys for Plaintiff*
         *City of Little Rock, Arkansas*

11

**CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2026, a true and correct copy of the City of Little Rock, Arkansas' Proposed Findings of Fact and Conclusions of Law was served on the following counsel of record through the Court's CM/ECF System:

Steven W. Quattlebaum, Ark. Bar No. 84127
Thomas H. Wyatt, Ark. Bar No. 2013273
**QUATTLEBAUM, GROOMS & TULL PLLC**
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
quattlebaum@qgtlaw.com
twyatt@qgtlaw.com

John A. Scialdone, Esq.
Katherine Halliday, Esq.
**SCIALDONE LAW FIRM, PLLC**
1319 24th Avenue
Gulfport, MS 39501
Telephone: (228) 822-9340
Facsimile: (228) 822-9343
jscialdone@slfirmus.com
khalliday@slfirmus.com

*Attorneys for Defendants*

Date: May 11, 2026                    By:    /s/ Jeffrey D. Cohen
                                              Jeffrey D. Cohen

12